# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **DARRYL J. MOORE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **No. 3:14-cv-00247** |
| **v.** | ) | **CHIEF JUDGE CRENSHAW** |
| | ) | |
| **STEVENSON NIXON, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>MEMORANDUM OPINION</u>

Darryl Moore, an inmate at Lois M. DeBerry Special Needs Facility in Nashville, Tennessee, initiated this action by filing a pro se petition for a writ of habeas corpus. (Doc. No. 1.) Moore is serving an effective sentence of ninety-three years after having pleaded guilty in the Davidson County Criminal Court to multiple drug-related offenses. Respondent answered Moore's pro se petition arguing that Moore's claims are without merit and should be dismissed. (Doc. No. 18.) Moore has retained counsel and filed an amendment to his petition that this Court allowed only for the purpose of supplementing his original claims. (Doc. Nos. 38, 46.)

This matter is ripe for review and the Court has jurisdiction under 28 U.S.C. § 2254(d). Upon review of the parties' filings, the Court finds that Moore is not entitled to relief on the grounds he asserts. His petition, therefore, will be denied and this action will be dismissed.

## I.    Background

### A.    Procedural History

Moore retained attorney Glenn Funk to serve as lead counsel for his trial proceedings and co-counsel Kimberly Hodde to litigate suppression motions regarding electronic surveillance evidence and the search of his residence. The trial court denied those motions after evidentiary hearings. (Doc. No. 19-1, PageID# 373–443; Doc. Nos. 19-3, 19-4, 19-7.) On December 3, 2007, Moore entered a conditional guilty plea in the Davidson County (Tennessee) Criminal Court to charges of conspiracy to deliver 300 grams or more of cocaine; conspiracy to deliver 300 pounds or more of marijuana; possession with intent to deliver 300 grams or more of cocaine; possession with intent to deliver 10 pounds or more of marijuana; money laundering; and unlawful possession of a weapon. (Doc. No. 19-2, PageID# 454.) Moore was sentenced on February 19, 2008, to an effective term of ninety-three years as a Range One standard offender: twenty-five years for each of the conspiracy and possession counts; twelve years for money laundering; four years for possession with intent to deliver; and two years for unlawful possession, with the sentences to be served consecutively. (Id. at PageID# 454, 483–488.) Moore's plea reserved the right to appeal the denial of his motions to suppress. (Doc. No. 19-2, PageID# 457–58.)

Funk was appointed to represent Moore on direct appeal. In the Tennessee Court of Criminal Appeals (TCCA), Moore argued that the trial court erred in denying his motion to suppress electronic surveillance evidence because:

> the three relevant wiretap applications lacked probable cause as required by Tennessee Code Annotated section 40–6–304(c)(1); (2) those wiretap applications failed to demonstrate the necessity of electronic surveillance as required by Tennessee Code Annotated section 40–6–304(a)(3); (3) the wiretap applications failed to particularize probable cause for the interception of direct connect communications in addition to normal phone calls and were thus

overbroad to the extent that such interception was authorized; (4) law enforcement failed to follow appropriate minimization procedures, as required by Tennessee Code Annotated section 40–6–304(e), including a failure to minimize calls using call waiting and call forwarding features; and (5) the State violated the sealing and confidentiality rules contained in Tennessee Code Annotated section 40–6–304(f). The Defendant also contends that the trial court erred in denying his motion to suppress the fruits of a search of his residence because: (1) police impermissibly searched areas of the residence without a warrant; and (2) the police's subsequently obtained warrant for further search of his residence did not contain probable cause. Finally, the Defendant argues that the trial court erred in ordering consecutive sentencing. After our review, we affirm the Defendant's convictions and sentences.

State v. Moore, 309 S.W.3d 512, 516–17 (Tenn. Crim. App. 2009).

The TCCA affirmed the trial court on all issues. Id. at 522–29. The Tennessee Supreme Court denied Moore's application for further review. (Doc. No. 19-15.)

Moore then filed a pro se petition seeking post-conviction relief in state court, and the trial court appointed David Hirschberg as post-conviction counsel. Moore raised the following post-conviction claims:

(1) Trial counsel was ineffective at Moore's sentencing hearing in his arguments and failure to call witnesses Moore requested;

(2) Trial counsel was ineffective for failing to request a Franks hearing;

(3) Trial counsel coerced Moore into pleading guilty; and

(4) Trial counsel was ineffective for failing to properly argue the suppression of the wiretap.

(Doc. No. 19-16, PageID# 1884.)

After an evidentiary hearing, the trial court denied Moore's post-conviction claims (Doc. No. 19-16, PageID# 1882–1922), and the TCCA affirmed that decision (Doc. No. 19-21). The Tennessee Supreme Court denied Moore's application for review. (Doc. No. 19-23.)

On January 30, 2014, Moore timely filed a pro se petition for a writ of habeas corpus and an accompanying memorandum in this Court. (Doc. Nos. 1, 2.) He requested the

appointment of counsel and permission to proceed *in forma pauperis*, (Doc. Nos. 3, 4), which the Court denied, (Doc. Nos. 5, 9). The Court conducted a preliminary review of Moore's petition and found that Moore stated at least one colorable claim for relief. (Doc. No. 9, PageID# 223.) The Court accordingly ordered a response to the petition. (Id. at PageID# 223–24.) The response was filed on April 17, 2014. (Doc. No. 18.)

Moore subsequently retained counsel, who moved to amend Moore's pro se petition. (Doc. No. 37.) In reviewing the motion to amend, Magistrate Judge Bryant found that Moore's pro se petition asserted the following claims:

> (1) Error in denying Moore's Motion to Suppress Electronic Surveillance Evidence due to the illegal issuance of the wiretaps in violation of due process, Tenn. Code Ann. 40-6-304(a)(3), and Title III 18 U.S.C. 2518(1)(c);
>
> (2) Ineffective assistance of trial counsel based on counsel's failure to request a Franks hearing to challenge the factual basis of the search warrants;
>
> (3) Ineffective assistance of trial counsel based on "[t]rial counsel's failure to properly argue wiretapping suppression motions;" and,
>
> (4) Error of the trial court in applying consecutive sentencing for the crimes of conviction.

(Doc. No. 42, PageID# 2451–52.)

Magistrate Judge Bryant found that the proposed amended petition included three additional claims for relief: (1) a claim of ineffective assistance of appellate counsel; (2) a claim of ineffective assistance of post-conviction counsel; and (3) a claim that the cumulative effect of trial, appellate, and post-conviction errors resulted in an unconstitutional conviction and sentence. (Id. at PageID# 2453.) Magistrate Judge Bryant recommended that Moore's motion for leave to amend be granted in part to allow him to supplement the original petition

and denied in part to prohibit Moore from adding the new claims. (Doc. No. 42, PageID# 2458.) The Court adopted the Report and Recommendation in full. (Doc. No. 46.)

Respondent did not answer the supplemental information provided by Moore's amended petition. Accordingly, before the Court are Moore's original petition and memorandum (Doc. Nos. 1, 2), supplemented by his amended petition (Doc. No. 38), and Respondent's answer to Moore's original petition (Doc. No. 18).

## B.    Statement of Facts

Hearing Moore's case on direct appeal, the TCCA summarized the facts related to the suppression issues as follows:

> Non-sentencing testimony in this case was presented at two hearings on defense motions to suppress evidence. The first hearing took place on March 28, 2007, and dealt with the Defendant's motion to suppress the fruits of electronic surveillance the police had conducted using wiretaps on cell phones owned by the Defendant and others. Officer Philip Taylor, an investigator with the Twentieth Judicial District Drug Task Force, served as the affiant on the wiretaps in this case and described himself as "the paperwork guy." He introduced into evidence a chart depicting all of the phone numbers wiretapped by police in the investigation underlying this case. Police first obtained an order on November 28, 2005, to wiretap a phone subscribed to by DeWayne Pollard but used by a co-defendant, Timothy Brown. Based on information received through that wiretap, on December 12, 2005, the Task Force obtained a wiretap on another phone subscribed to and used by Brown and then another used by Brown but subscribed to by Lavonzel Adams on December 29, 2005.

> Based on conversations intercepted on those wiretaps, on January 23, 2006, the Task Force obtained another wiretap on a phone subscribed to and used by Charles Farrar. David Moore, the Defendant's brother, was intercepted on that wiretap and on previous wiretaps, leading to a January 24, 2006 wiretap on a phone subscribed to by Barbara Moore but used by David Moore. The Defendant and his phone number were intercepted on that wiretap on March 17, 2006, leading to a wiretap on his phone beginning on March 23, 2006. This case predominantly concerns the wiretaps on Brown, David Moore, and the Defendant. All targeted phones in this case are cellular phones.

> Judge Monte Watkins issued the wiretap orders in this case. Officer Taylor described the procedures followed to intercept communications and ensure compliance with Judge Watkins' orders. The police maintain a secure wiretap

room containing computers designed to intercept and record any communications to or from a target phone. The computer allows the person monitoring a call to note a synopsis of its contents and the parties involved in the communication. If a call is deemed to be non-pertinent to the targeted criminal activity and therefore outside the scope of the wiretap order, the monitor is to click a particular button on the screen, thereby minimizing the audio feed and ceasing to record. Any monitored conversation or portion thereof is recorded to a write-only hard drive.

The minimization practices in this case provided monitors with a "spot-monitoring" interval. Officer Taylor explained that these intervals typically range from fifteen to sixty seconds. A monitor is allowed to temporarily re-engage a previously minimized audio feed as each spot-monitoring interval passes in order to confirm that the intercepted conversation still involves the same parties and is still non-pertinent. Officer Taylor then described the problems that can be caused by target phones with call waiting and call forwarding features:

> [Officer Taylor]: Call forwarding and call waiting are features that cause problems if they're used extensively by the target. If you're off a call for thirty seconds, some targets that use it extensively can have a call come in for fifteen or twenty seconds during that time or any portion of that time you've got it minimized. And that, of course, is lost. It will show the call record that that call came in, but the audio on it will not appear anywhere in the system. So that's one of the considerations we have to weigh out when we're deciding how long and when to minimize and whether they use that feature, whether they were expecting a call from somebody, from a co-conspirator that may just be, hey, I'm at the hotel, which wouldn't take but fifteen or twenty seconds, and you could miss it if ... you've got the call minimized for a minute or so. In forty-five seconds to a minute you could miss the call.

Officer Taylor noted that most of the phones targeted in the investigation had a call waiting feature, including the Defendant's. He also testified that the police tended to develop monitoring practices based on their determination of whether a particular target frequently used such features, not based merely on the presence of such features. Police thus fully developed minimization procedures after surveillance began.

On cross-examination, Officer Taylor also discussed another service enabled on the Defendant's phone called "push-to-talk," "direct connect" or "chirping." The direct connect feature allows a phone to act as a walkie-talkie, meaning that the phone can transmit a one-sided message to a similarly-enabled phone and then wait for a response. Rather than taking place across a connection

between two phone numbers, a direct connect device is contacted through the use of a separate direct connect number. Officer Taylor testified that the wiretap application for the Defendant's phone included its native ESN number, meaning any communications from that device would be intercepted. The application did not, however, specifically mention interception of communications made using the direct connect function.

Officer Taylor also noted his awareness that members of the news media retrieved and broadcast recordings of certain communications intercepted during the Task Force's investigation.

The trial court then, on May 9, 2007, held a second hearing in order to rule on the Defendant's motion to suppress the fruits of a warrantless entry onto his property and a subsequent warrant-supported search. The events at issue in this second hearing occurred on April 1, 2006. On that day, Edward Rigsby, a Metro Nashville Police Department officer assigned to the Twentieth Judicial District Drug Task Force, was charged with operating the wire room and intercepting calls to and from the Defendant's phone. After recording pertinent calls, he would review them and pass information on to field officers.

Officer Rigsby's testimony, as well as his affidavit in support of the warrant eventually used in this case, establish a sequence of pertinent phone calls to and from the Defendant's cell. On March 28, 2006, the Defendant made a call to an unknown Hispanic subject and said that his "dude from Kentucky" would not arrive until Friday. The unknown subject asked the Defendant "how many" he wanted him to send. The Defendant replied, "20 or 30."

Two days later, on March 30, 2006, the Defendant received a call from the same unknown subject. He advised the Defendant that "Felix" would arrive at 6:00 or 7:00 p.m. The Defendant responded that the "dude from Kentucky," who "owed him for like 10 or 8" would not arrive until after that time, and he asked to have Felix delay until Saturday.

Officer Rigsby intercepted a number of calls on April 1, 2006. The first came at 8:58 a.m. from Rodney Gilbert, who, receiving no answer from the Defendant, left a message asking the Defendant to call so he could "give [the Defendant] what he got from him." Between 9:03 and 9:05 a.m., the Defendant received two calls from the unknown subject, during which the Defendant arranged to meet "Felix" in one hour. At 9:06 a.m., the Defendant called Gilbert and arranged to meet in thirty minutes. The Defendant's destination was "pop's house," a term known by police to refer to the Defendant's father's residence at 1001 West Delmas. No phone call indicated the type of vehicle in which the drug delivery would arrive.

Based on this information, police set up surveillance of 1001 West Delmas on April 1. Sergeant James McWright testified that his and two other unmarked

police cars sat near railroad tracks about two blocks away from the driveway and near the intersection of West Delmas and Cherokee Road. Other unmarked cars were positioned some distance down West Delmas, on the other side of the residence. Tennessee Bureau of Investigation Agent Joey Clark provided aerial surveillance from a circling aircraft. Sergeant McWright had a good view of the driveway, but the layout of the residence and surrounding grounds made it impossible to set up surveillance with a clear view of the house. Sergeant McWright also judged that anyone placed around the back of the house would have been discovered.

After some time, Sgt. McWright and the other surveillance officers observed a tan Nissan Pathfinder turn onto West Delmas and proceed into the driveway. No officer could see into the Pathfinder, and therefore, they could not determine whether it carried a delivery of drugs. It was believed that two men were in the Pathfinder, but no officer could confirm whether they were Hispanic. Sergeant McWright had never seen the Pathfinder before, although he had not conducted extensive surveillance on the house before and was not familiar with all of the vehicles normally present at the house. From his aircraft, Agent Clark informed Sgt. McWright that the Pathfinder had driven inside the detached garage behind the house and had closed the garage door behind it. This occurred at about 11:17 a.m.

Shortly thereafter, Sgt. McWright saw a red Corvette convertible turn from Cherokee onto West Delmas directly in front of his surveillance location. Sergeant McWright knew from previous wiretaps that one of the Defendant's associates, Lorenzo Roberts, had just purchased a red Corvette. Driving by, Roberts "looked dead at" Sgt. McWright and "did a double take." Roberts then proceeded down West Delmas but drove past the house, eventually disappearing from view.

Officer Rigsby then, at 11:22 a.m., intercepted the following conversation between the Defendant and Roberts:

> [The Defendant]: Hello.
>
> [Roberts]: D–Money.
>
> [The Defendant]: What up my niggs?
>
> [Roberts]: Man D I just seen some of the ... D for real dude. Is this line good.
>
> [The Defendant]: Yeah, I'm good.
>
> [Roberts]: Naw D, I just seen some of the weirdest shit D. I ain't even bullshittin' dude.

[The Defendant]: What?

[Roberts]: I . . . just bro . . .   listen . . .   listen closely what I'm saying.

[The Defendant]: I'm listening.

[Roberts]: You know when I say them.

[The Defendant]: When you what?

[Roberts]: Them. Them.

[The Defendant]: Who is them?

[Roberts]: You know who them is . . . . Them.
[The Defendant]: The folks.

[Roberts]: Ah-huh.

[The Defendant]: Ah-huh.

[Roberts]: On . . .   on . . .   like by on Pops street. And then I'm talkin' about them mother fuckers look like they waiting on something. And I'm not even . . . .

[The Defendant]: On my street?

[Roberts]: Yeah. Them mother fuckers look like they waitin' on something dude I'm talking about . . .   I'm coming over the railroad tracks. I see a couple two three, I'm like damn, they look like them ... they on the side of the street. You know what I mean, like just sittin' waitin'.

[The Defendant]: Ah my nigga, and . . .   and my folks is right here.

[Roberts]: Where they . . .   not on that street.

[The Defendant]: Yeah, they in my garage right now.

[Roberts]: I'm not even bull shittin' D.

[The Defendant]: Oh my God. Oh yeah.

[Roberts]: Man I ... I am not even bull shittin' dude.

[The Defendant]: God damn.

[Roberts]: They need to . . . .   They need to man whatever . . .   and in a bag jump the fence and keep on going never come up out of that mother fucker. I'm not . . .

[The Defendant]: Okay. Okay.

[Roberts]: They need to get.

[The Defendant]: For sure.

[Roberts]: All right, one.

Officer Rigsby testified regarding his interpretation of this conversation. In his experience, the Defendant used the word "folks" to refer to both police and suppliers; in the conversation above, Officer Rigsby believed that the Defendant eventually understood "the folks" to mean "police." The Defendant then referred to "[his] folks," meaning the suppliers that had earlier arrived in the Pathfinder.

After Officer Rigsby relayed the substance of the call, Sgt. McWright ordered his team to prepare to secure the property. Sergeant McWright had no specific information about any fleeing suspect or about any drugs being destroyed, although he testified that he had known large-volume drug dealers to keep vats of acid in which large quantities of drugs could be dissolved in an emergency. Sergeant McWright called for two backup units to assist them. When those units arrived at 11:35 a.m., Sgt. McWright ordered the scene secured. He did not participate, however, instead driving away to look for Roberts.

After receiving Sgt. McWright's order, Sgt. Richard Hamilton moved behind 1001 West Delmas to its detached garage. He saw that some Sumner County officers had already secured the Defendant's father, James Moore. Other officers stood near the detached garage; both of its carport doors were down, and the single walk-through door was locked. James Moore said he had a garage door opener in his truck. He retrieved it. An officer pressed the door opener two or three times; each time, one of the garage doors went up a few feet before stopping and going back down. Each time, officers could see someone's leg inside the garage.

Sergeant Hamilton therefore ordered other officers to kick down the walk-through door. They did so. The Defendant walked out the door, laid on the ground, and was taken into custody. Officers entered the garage and found Felix Mejia and Jorge Lemus inside. The two were taken into custody. The Defendant, Mejia, and Lemus were each placed into separate police cars. While the three suspects were being removed from the garage, Agent Kelly Murphy

saw a yellow fifty-five-gallon drum sitting about ten feet from the Pathfinder. He also saw what appeared to be twelve kilograms of cocaine sat on top of the drum. Officers checked the residence for any potential dangers, but they did not otherwise search it.

Officer Rigsby then began preparing a warrant for the search of 1001 West Delmas and four other locations of interest in the wider investigation. He did not arrive with the warrant until 9:00 p.m., finding officers still at the residence, having preserved the integrity of the scene. When Officer Rigsby arrived at 1001 West Delmas, he found Sgt. Hamilton in the kitchen with James Moore, upon whom Officer Rigsby served the warrant. Officers found no contraband inside the house. Upon a thorough search of the garage, however, they found a loaded twenty-gauge shotgun, a loaded handgun, approximately 100 pounds of cocaine, and approximately 100 pounds of marijuana.

Moore, 309 S.W.3d at 517–21.

In its review of Moore's post-conviction claims, the TCCA summarized the following evidence presented during the post-conviction hearing that pertains to Moore's claims regarding ineffective assistance of counsel:

At the evidentiary hearing, lead counsel testified that he had been practicing law for twenty-six years, working as a prosecutor for four years and as a criminal defense attorney for twenty-two years. In 2006, the Petitioner retained lead counsel in this case. The case involved a ten-count indictment with multiple co-defendants. Lead counsel said that he did not have "extensive experience in wiretap cases," that another attorney was working with him on an additional wiretapping case, and that he "enlisted" her to help him with this case. Lead counsel and co-counsel met with the Petitioner. Lead counsel said that the Petitioner probably was the most intelligent client he had ever represented, that the Petitioner asked co-counsel some "very pointed and direct questions," and that the Petitioner decided to hire co-counsel. Lead counsel said co-counsel was to "handle the wiretap issues" while he handled the suppression issues related to the search of the Petitioner's father's home and "any other part of the case."

Lead counsel testified that he met with the Petitioner more than twenty times, not including court appearances. He said that when the trial court denied the Petitioner's motions to suppress, he told the Petitioner that "our chances of winning the case at trial were close to zero and that this was not a case that if we tried we had a chance to win." He said that the State never made a plea offer with "a finite number of years" but that the State offered for the Petitioner to "plead open." In exchange for the Petitioner's guilty pleas, the State would dismiss the case against his father and allow the Petitioner to reserve a certified

question of law. The State also made a plea offer to the Petitioner's father, which was contingent upon the Petitioner's accepting the [State's] plea offer. Lead counsel said that he met with the Petitioner and that the Petitioner "was apprised of how his plea would impact his father." Erik Herbert, counsel for the Petitioner's father, may have been present during the meeting, but lead counsel could not remember. Lead counsel said that if the Petitioner had turned down the State's offer, the Petitioner's father "would have been sitting next to us at trial." Lead counsel said that the State never should have charged the Petitioner's father and that it would have been a "travesty" for the Petitioner's father to have been convicted of a crime.

Lead counsel testified that he gave the Petitioner "all the paperwork out of this case," and he acknowledged that he was familiar with a <u>Franks</u> hearing. Lead counsel did not see any reckless or misleading statements in the wiretap applications that would have warranted a <u>Franks</u> hearing. He said that if the Petitioner had asked him to subpoena the Petitioner's federal probation officer, Ed Towe, to the sentencing hearing, he would have done so. However, lead counsel said he would have been "extremely reluctant" to call Towe as a witness because Towe "would have taken that opportunity to do whatever he could to have painted [the Petitioner] in a bad light." He said Towe was "not someone who will accentuate the positive. He will accentuate the negative." Lead counsel had a couple of witnesses testify at the sentencing hearing about the Petitioner's good character. Lead counsel said that "<u>Gomez</u> was my case" and that he argued <u>Gomez</u> and <u>Blakely</u> at the sentencing hearing.

On cross-examination, lead counsel testified that at the time of the plea negotiations, the Petitioner's father's home was the subject of a federal civil forfeiture. The Petitioner had copies of all of the wiretap applications and never told lead counsel that the applications contained false statements. Upon being questioned by the post-conviction court, lead counsel acknowledged that he argued against consecutive sentencing. Lead counsel told the post-conviction court, "No offense, Judge, but taking a Range 1 person and maxing them out and giving them all consecutive time, I think that was too harsh." Lead counsel appealed the Petitioner's case to the state supreme court and appealed the wiretapping issues to the United States Supreme Court. However, both courts refused to consider the case.

The Petitioner testified that he was indicted in June 2006 and that he and lead counsel discussed the indictments. The Petitioner consented to lead counsel's hiring co-counsel because co-counsel had specialized knowledge about wiretaps. The Petitioner and lead counsel discussed the defense's strategy, and the Petitioner was prepared to go to trial. The Petitioner said that the State made an offer with "open sentencing" and that he refused to accept the offer. Three days before the Petitioner's scheduled trial, lead counsel and Erik Herbert, who was representing the Petitioner's father, visited the Petitioner in jail. Herbert told the Petitioner that there was a two percent chance the jury

would convict his father. The Petitioner said Herbert also told him that his father "seemed to be stressed out really bad about the trial, he wasn't feeling well and so on and so forth." The Petitioner said he "perceived" Herbert to be telling him that his father was "sickly." He said that he loved his father with all of his heart, that he was not allowed to contact his father, and that "the main thing to me was that even if I had to face ninety-three years it wasn't worth my father going through it." He immediately decided to accept the State's plea offer. After the trial court sentenced the Petitioner, the Petitioner's father visited him, and the Petitioner learned his father had not been sick. He said that he was misled about his father's condition and that he entered his pleas based on what he was told.

The Petitioner testified that lead counsel and co-counsel never discussed a *Franks* hearing with him. The Petitioner later learned that counsel should have requested a hearing. He said that he had standing to challenge the wiretap of two telephones and that a *Franks* hearing was necessary because counsel could have used omissions in the wiretap applications to show "the requisite necessity falls short." Lead counsel should have called the Petitioner's accountant, Sam Mansour, to testify at his sentencing hearing. Mansour possessed the Petitioner's income tax files, could have established a work history for the Petitioner, and could have shown that the Petitioner was not a professional criminal. Lead counsel told the Petitioner that he talked with Mansour but that Mansour no longer had the Petitioner's income tax records. Lead counsel argued at sentencing that <u>Blakely</u> prohibited consecutive sentences, but the trial court told counsel that <u>Blakely</u> did not apply. The Petitioner said other "prevailing cases" were available that lead counsel could have argued regarding the Petitioner's being a professional criminal or having an extensive criminal history. The Petitioner said lead counsel "got so carried away with the Blakely fix" that he never used "the other prevailing cases."

On cross-examination, the Petitioner testified that Herbert told him that his father was not feeling well, was stressed, and had high blood pressure. Herbert claimed the Petitioner's father "was really not up to standing trial." After hearing about his father's health, the Petitioner pled guilty so that the State would release his father. The Petitioner assumed that the State also would dismiss the forfeiture action against his father's home. He said that he could have shown at trial that he was not guilty of all six counts. The State asked him to describe the defenses he would have used at trial, and he answered, "I don't know." He said that from 1994 to 1999, he owned three businesses and that his accountant did his "book work." Thus, his accountant could have established that he was not a professional criminal. The Petitioner's federal probation officer also could have testified that the Petitioner was employed by Carl Black Chevrolet and that the Petitioner worked from his studio at home.

Co-counsel testified that the Petitioner was very intelligent and was very interested in his case. She said that her representation of him was limited to

"litigating the suppression motion on the wiretap" and that she was "pretty much out of the case" by the time of the plea negotiations. However, she helped prepare some paperwork related to reserving the certified question of law. If the Petitioner had not pled guilty, co-counsel would not have participated in his trial. On cross-examination, co-counsel testified that although she had not interviewed Ed Towe and did not know specifically what he would say about the Petitioner, she had known Towe "long enough and have been a defense lawyer long enough to know I would be loathe to call Mr. Towe."

Erik Regis Herbert testified that he represented the Petitioner's father and met with the Petitioner in jail one time. The Petitioner's lead counsel also was present. The Petitioner's father had received a plea offer from the State, and the offer was contingent upon the Petitioner's accepting the Petitioner's plea offer. The meeting occurred a few days before the trial was scheduled to begin, and the purpose of the meeting was to talk with the Petitioner about his father's offer. The Petitioner's father wanted to accept the State's offer, but Herbert was prepared to try the case. He said that "the whole criminal experience had been very draining on [the Petitioner's father]" and that the Petitioner's father was "very stressed."

On cross-examination, Herbert testified that the Petitioner was concerned about his father and asked Herbert about his father's plea offer. Herbert told the Petitioner that his father wanted to accept the offer, which included dismissing the civil action for forfeiture of his father's home. Herbert's meeting with the Petitioner was brief, and Herbert did not give the Petitioner any false or incorrect information.

James Earl Moore, the Petitioner's father, testified that he pled guilty in exchange for probation and the opportunity to have his conviction expunged. He said that neither his counsel nor the Petitioner's counsel asked for his permission to visit the Petitioner and that he learned about their meeting with the Petitioner about one and one-half years after the meeting. He said he was worried about his case but "not to the point where I was sick or stressed out or anything like that." He never visited his physician as a result of this case and was surprised to learn about counsels' meeting with the Petitioner. Mr. Moore said that he had wanted the Petitioner to do what was best for the Petitioner and that the decision about whether to go to trial was the Petitioner's decision. If going to trial would have been best for the Petitioner, then Mr. Moore also would have gone to trial.

The State recalled lead counsel as its only witness. Lead counsel testified that he and Erik Herbert met with the Petitioner so that the Petitioner could talk directly with Herbert about his father's plea offer. Lead counsel said he did not suggest to the Petitioner that he plead guilty but let him know the terms of his offer "which was not really an offer to [the Petitioner] so much as an offer to [the Petitioner's] father." Lead counsel said he and Herbert talked with the Petitioner about his father's "civil exposure" and "the stress of going through a

trial." At the conclusion of the meeting, the Petitioner indicated that he wanted to plead guilty. Lead counsel said that the Petitioner's "motivation ... was completely to make sure that his dad was protected." Regarding the Petitioner's cocaine and conspiracy to possess cocaine charges, the Petitioner did not have any defenses. As to the marijuana charges, the marijuana had been in the garage for an extended period of time. Therefore, a question existed as to whether the Petitioner ever owned or possessed the marijuana. Lead counsel thought he also could have contested the weapons charges. He said that the likelihood of the jury's convicting the Petitioner of money laundering was "nearly one hundred percent."

On cross-examination, lead counsel acknowledged that he and Herbert met with the Petitioner for forty-five minutes. Herbert attended the meeting in case the Petitioner had specific questions about his father's plea offer.

Moore v. State, No. M2012-01707-CCA-R3PC, 2013 WL 4677578, at *2–6 (Tenn. Crim. App. Aug. 28, 2013)

## II.    Issues Presented for Review

Moore's pro se petition, supplemented by his amended petition, raises the following

claims:

(1) The trial court erred in denying Moore's Motion to Suppress Electronic Surveillance Evidence due to the illegal issuance of wiretaps in violation of Moore's due process rights, Tenn. Code Ann. § 40-6-304(a)(3) (authorizing the interception of communications upon a full and complete statement that other investigative procedures have been tried and failed, would be unlikely to succeed, or are too dangerous), and 18 U.S.C. § 2518(1)(c) (authorizing interception of communications on the same grounds);

(2) Ineffective assistance of trial counsel for failure to request a Franks hearing to challenge the relevant search warrants;

(3) Ineffective assistance of appellate counsel for failure to properly argue the suppression motions on appeal; and,

(4) Error by the trial court in applying consecutive sentencing for the crimes of which Moore was convicted.

(Doc. No. 1.)

## III.   Legal Standard

Moore's petition is governed by the Antiterrorism and Effective Death Penalty Act

(AEDPA), Pub. L. No. 104-132, 110 Stat. 1214. AEDPA "dictates a highly deferential

standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Bell v. Cone, 543 U.S. 447, 455 (2005); see also Hardy v. Cross, 565 U.S. 65, 66 (2011); Felkner v. Jackson, 562 U.S. 594, 597 (2011). "AEDPA requires heightened respect for state court factual and legal determinations." Lundgren v. Mitchell, 440 F. 3d 754, 762 (6th Cir. 2006). "State-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence." Davis v. Ayala, 135 S. Ct. 2187, 2199–2200 (2015).

The AEDPA standard is difficult to meet "because it was meant to be." Harrington v. Richter, 562 U.S. 86, 102 (2011); see Burt, 134 S. Ct. at 16; Metrish v. Lancaster, 569 U.S. 351, 357–58 (2013); Cullen v. Pinholster, 563 U.S. 170, 181 (2011). The statute enforces the principle that "habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Harrington, 563 U.S. at 102–03; see Woods v. Donald, 125 S. Ct. 1372, 1376 (2015). AEDPA prevents federal "retrials" of matters decided by the state court and "ensure[s] that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002) (Bell II). Under its provisions, petitioners may not "us[e] federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Parker v. Matthews, 567 U.S. 37, 38 (2012); see also White v. Wheeler, 136 S. Ct. 456, 460 (2015) (explaining that the Supreme Court, "time and again, has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court'") (quoting Burt v. Titlow, 134 S. Ct. 10, 16 (2013)).

The statute provides for the review of state court decisions in § 2254(d), which states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in United States Supreme Court decisions or if it decides a case differently than the United States Supreme Court has done on a set of materially indistinguishable facts. Bell II, 535 U.S. at 694 (citing Williams, 529 U.S. at 405–06). In determining whether federal law is clearly established, this Court may not rely on the decisions of lower federal courts. Lopez v. Smith, 135 S. Ct. 1, 4 (2014); Harris v. Stovall, 212 F.3d 940, 943–44 (6th Cir. 2000). AEDPA limits the source of law applied in determining whether a state court decision is "contrary to" clearly established federal law to the holdings, not dicta, of cases decided by the United States Supreme Court. Williams v. Taylor, 529 U.S. 362, 412 (2000); Bailey v. Mitchell, 271 F.3d 652, 655 (6th Cir. 2001). Moreover, "clearly established Federal law" under AEDPA does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. Greene v. Fisher, 565 U.S. 34, 39 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Tennessee state courts in light of Supreme Court precedent at the time of the state court's adjudication on the merits. Miller v. Stovall, 742 F.3d 642, 644–45 (6th Cir. 2014) (citing Green, 565 U.S. at 38).

The Court may grant relief under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from United States Supreme Court decisions but unreasonably applies it to the facts of the particular case." Id. A federal habeas court may not find a state court adjudication to be unreasonable "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Williams, 529 U.S. at 411; accord Bell II, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." Williams, 529 U.S. at 409. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." White v. Woodall, 134 S. Ct. 1697, 1706–07 (2014) (quoting Harrington, 562 U.S. at 103).

AEDPA also imposes a total exhaustion requirement, contained in 28 U.S.C. § 2254(b) and (c), which directs that "[a]n application for a writ of habeas corpus . . . shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State" or such remedies are no longer available. Rhines v. Weber, 544 U.S. 269, 274 (2005). With certain limited exceptions, to properly exhaust a claim under AEDPA, the petitioner must have raised the same claim on the same grounds before the state courts. Pinholster, 563 U.S. at 182; Kelly v. Lazaroff, 846 F.3d 819, 828 (6th Cir. 2017) (quoting Wagner v. Smith, 581 F.3d 410, 417 (6th Cir. 2009)) (petitioner must present the "same claim under the same theory" to the state court). "Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts

one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Lyons v. Stovall, 188 F.3d 327, 331 (6th Cir. 1999). In Tennessee courts, a petitioner has exhausted all available state remedies when the TCCA has denied a claim of error. Adams v. Holland, 330 F.3d 398, 401 (6th Cir. 2003) (citing Tenn. Sup. Ct. R. 39).

"[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." Coleman, 501 U.S. at 732. If the claims can no longer be considered by the state court because they are procedurally barred under state law, they are considered defaulted for purposes of federal review. A petitioner must "demonstrate cause for his state-court default of *any* federal claim, and prejudice therefrom, before the federal habeas court will consider the merits of that claim." Edwards v. Carpenter, 529 U.S. 446, 451 (2000).

## IV.     Analysis

### A.     Motion to Suppress Electronic Evidence

Moore first asserts that the state courts erred in denying his motion to suppress electronic evidence because "[t]he challenged evidence was obtained via unlawfully intercepted wire and/or electronic communications and/or illegal seizures/searches contrary to the Fourth Amendment to the Constitution of the United States, Article I, section 7 of the Tennessee Constitution, 18 U.S.C. § 2515–2518, and Tenn. Code Ann. § 40-6-301, *et seq.* and 39-13-601, *et seq.*" (Doc. No. 1, PageID# 12, 25; Doc. No. 2, PageID# 22; Doc. No. 28, PageID# 2258.) Although Moore references the Fourth Amendment and state law in his petition, his primary argument before this Court appears to be that the relevant wiretap applications did not sufficiently establish that use of a wiretap was necessary as required by

the federal Wiretap statute because they did not contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).

## 1. Fourth Amendment Claim

To the extent Moore argues that the state courts unreasonably denied his claim under the Fourth Amendment, he cannot find relief in this Court. "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the grounds that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Stone v. Powell, 428 U.S. 465, 482 (1976); Rashad v. Lafler, 675 F.3d 564, 570 (6th Cir. 2012) ("Long-standing precedent precludes us from granting habeas relief based on a state court's failure to apply the exclusionary rule of the Fourth Amendment, unless the claimant shows that the State did not provide him 'an opportunity for full and fair litigation of [his] Fourth Amendment Claim." (quoting Stone, 428 U.S. at 493)). The Sixth Circuit construes this rule to require that a petitioner have "an available avenue for the prisoner to present his claim to the state courts, not an inquiry into the adequacy of the procedure actually used to resolve that particular claim." Good v. Berghuis, 729 F.3d 636, 639 (6th Cir. 2013).

Moore had an adequate avenue in state court for consideration of his Fourth Amendment claims. The trial court conducted two hearings on Moore's motions to suppress evidence. (Doc. Nos. 19-3, 19-7.) The TCCA considered and affirmed the denial of his suppression motions on direct appeal. Moore I, 309 S.W.3d at 522–29. The availability of those state forums precludes further review by this Court. Good, 729 F. 3d at 640.

### 2. State Law Claim

Insofar as Moore raises a separate claim based upon violations of Tennessee law, this claim must also be denied. (Doc. No. 2, PageID# 22 (citing Tenn. Code Ann. § 40-6-304 (2007)).) A claim involving only state law cannot give rise to habeas relief. Estelle v. McGuire, 502 U.S. 62, 67–68 (1991); see Kissner v. Palmer, 826 F.3d 898, 902 (6th Cir. 2016) ("[F]ederal habeas corpus relief does not lie for errors of state law." (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990))). Because Moore has presented no argument in support of a freestanding claim based on the state courts' interpretation of Tennessee law, this claim must also be denied.

### 3. Federal Wiretap Statute Claim

Finally, Moore's claim based on the federal wiretapping statute, 18 U.S.C. § 2515 *et seq.*, must also be denied. Evidence obtained in violation of the wiretap statute must be excluded under that statute. Id. §§ 2516, 2616(2), 2518(1). In a habeas petition, however, this Court cannot recognize a claim for violation of a federal statute if it is "neither jurisdictional nor constitutional . . . not a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary demands of fair procedure" and does not "present exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." Hill v. United States, 368 U.S. 424, 428 (1962). The Ninth and Seventh Circuits have found this standard not to be met in the context of a wiretap statute claim where the petitioner has received a full and fair hearing on his suppression motion in state court and offers no reason to believe the wiretap evidence was

unreliable or that he is innocent of the crime of conviction.[1] See Lord v. Lambert, 347 F.3d 1091, 1095 (9th Cir. 2003); Hussong v. Warden, Wisconsin State Reformatory, 623 F.2d 1185, 1191 (7th Cir. 1980).

Here, Moore received a full and fair hearing in the state courts on the admissibility of the electronic surveillance evidence. He fully argued the merits of his suppression claim before the trial court in an evidentiary hearing. His claim was also briefed and argued before the TCCA and presented to the TSC. Moore was convicted based on "qualitatively unimpaired evidence even though it may have been tainted because of procedural irregularities." Hussong, 623 F.2d at 1191. Moore's claim is not cognizable on habeas review because the alleged violations of the federal wiretap statute did not result in a complete miscarriage of justice or denial of fair procedure.[2]

## B.    Ineffective Assistance of Counsel

This Court evaluates a petitioner's claim that his trial or appellate counsel was ineffective under the standard established by Strickland v. Washington, 466 U.S. 668, 690 (1984). Strickland sets a two-part test to evaluate whether counsel has been constitutionally

---

[1]    Two courts have found that Stone v. Powell limits habeas review of alleged violations of provisions of the wiretap statute that implement a Fourth Amendment policy.  Anderson v. Hopkins, 113 F.3d 825, 831 (8th Cir. 1997), *order modified on other grounds*, 122 F.3d 1160 (8th Cir. 1997); Zagarino v. West, 422 F. Supp. 812, 819 (E.D.N.Y. 1976). The Anderson and Zagarino courts found that "the scope of review" in this context "is limited to ascertaining whether the petitioner had a full and fair opportunity to litigate his claim in the state courts." Zagarino, 422 F. Supp at 820. If the Court applied this standard, Moore's claim would fail for the same reasons as his Fourth Amendment claim.

[2]    Although the Amended Petition does not allege a procedural due process violation, Moore's memorandum of law in support of his original petition makes some reference to "due process."  (See, e.g., Doc. No. 2, PageID# 22, 25.) To the extent Moore attempts to bring such a claim based on the wiretap applications, no Supreme Court precedent holds that a violation of the wiretap statute may result in a due process claim cognizable on federal habeas corpus review. See Wright v. Van Patten, 552 U.S. 120, 126 (2008) (holding that where the

ineffective. A petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness and (2) that, but for counsel's deficient representation, "the result of the proceeding would have been different." Strickland, 466 U.S. at 688–89, 694. The Strickland standard sets a high bar that is not easily surmounted by habeas petitioners. Padilla v. Kentucky, 559 U.S. 356, 371 (2010). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Knowles v. Mirzayance, 556 U.S. 111, 124 (2009) (quoting Strickland, 466 U.S. at 690).

Where a state court correctly identifies Strickland as the controlling precedent and applies it in evaluating a petitioner's claims, this Court applies a doubly deferential standard in its review. Leonard v. Warden, Ohio State Penitentiary, 846 F.3d 832, 848 (6th Cir. 2017). The Court must ask "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard" and, if so, must deny relief. Id. (quoting Harrington v. Richter, 562 U.S. 86, 89 (2011)). "The pivotal question," therefore, is not whether this Court would find counsel's performance deficient, but "whether the state court's application of the Strickland standard was unreasonable." Harrington, 562 U.S. at 101. The Court considers the TCCA's determination of each of Moore's ineffective assistance claims through this doubly deferential lens.

### 1. Failure to Request a Franks Hearing

Moore claims that trial counsel's failure to request a Franks hearing constituted ineffective assistance and that, in finding otherwise, the state post-conviction court unreasonably applied Strickland. (Doc. No. 2, PageID# 28; Doc. No. 38, PageID# 2318.) Under Franks v. Delaware, "where the defendant makes a substantial preliminary showing

---

Supreme Court has not given clear guidance, a state court cannot have unreasonably applied clearly established federal law).

that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." 438 U.S. 154, 155–56 (1978). The TCCA determined this claim as follows in its review of Moore's post-conviction proceedings:

> On appeal, the Petitioner argues that trial counsel, particularly co-counsel, were ineffective for failing to request a Franks hearing in order to argue the "necessity requirement." In Franks v. Delaware, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the United States Supreme Court held that an attack on a facially valid search warrant requires that a defendant make "allegations of deliberate falsehood or of reckless disregard for truth, and those allegations must be accompanied by an offer of proof." However, the post-conviction court specifically accredited lead counsel's testimony that a Franks hearing was not warranted in this case. Moreover, as noted by the post-conviction court in its order denying relief, the Petitioner failed to cite to a single incident of deliberate falsehood or reckless disregard for the truth in the wiretap applications. Therefore, he is not entitled to post-conviction relief.

Moore II, 2013 WL 4677578, at *8.

Trial counsel's failure to request a Franks hearing did not fall outside the bounds of competent representation. At the post-conviction hearing, lead counsel did not "recall [Moore] ever disputing anything in" the wiretap affidavits, nor did [lead counsel] personally think the affidavits included anything "that was recklessly stated or misleading." (Doc. No. 19-17, PageID# 1946, 1953.) Although he acknowledged the officers had used boilerplate language in the warrants and, in some places, "just ignored the requirement to do an independent investigation," lead counsel and Moore never had a discussion about the affidavits being "not true or . . . false . . . or deliberately misleading." (Id.) Lead counsel also testified that Moore never told him he thought there were "false statements made in the applications for the wiretaps." (Id. at PageID# 1967.) Moore testified that, although he was unfamiliar with Franks hearings at the time, he later came to understand that one "should have been requested

under the circumstances." (<u>Id.</u>at PageID# 1993.) Moore testified that, with a <u>Franks</u> hearing, he could have obtained testimony from the State that it did not try any other investigative avenues before it requested a wiretap on David Moore's phone, which would help him show that "the requisite necessity [for obtaining a wiretap] falls short." (<u>Id.</u> at PageID# 1997–98.)

The TCCA's determination that the performance of Moore's counsel was adequate was a reasonable application of <u>Strickland</u>. As the court noted, the petition for post-conviction relief failed to reference any specific falsehood or instance of reckless disregard for truth in the wiretap applications, and the trial court credited lead counsel's testimony that he did not view any statements in the wiretap applications as being false or recklessly misleading. <u>Moore</u>, 2013 WL 4677578, at *8. Although Moore's Amended Petition attempts to cure the deficiency of his failure to cite particular instances of deliberate falsehoods or reckless disregard for the truth (Doc. No. 38, PageID# 2317–18), Moore did not testify to these facts at his post-conviction hearing or otherwise present them to any state court, precluding this Court's consideration of the new allegations. <u>Carter v. Mitchell</u>, 829 F.3d 455, 465 (6th Cir. 2016) (citing <u>Cullen v. Pinholster</u>, 563 U.S. at 181 (noting that the Supreme Court has limited the "record under review" in federal habeas proceedings to "the record before the state court"). Trial counsel's failure to request a <u>Franks</u> hearing does not entitle Moore to habeas relief.

### 2. Suppression Hearing

Moore alleges that his trial counsel was ineffective for failing to properly argue for the suppression of electronic surveillance evidence obtained through a wiretap. In particular, he argues that co-counsel failed to argue that the wiretap application for co-defendant David Moore's phone, one of only two applications Moore had standing to challenge, lacked the

required showing of necessity. (Doc. No. 2, PageID# 33; Doc. No. 38, PageID# 2316–17.) Respondent argues that this claim is procedurally defaulted because Moore did not raise it before the TCCA. (Doc. No. 18, PageID# 250.)

Although the TCCA did not consider this aspect of Moore's ineffective assistance claim, it is not procedurally defaulted. Moore was not required to argue ineffective assistance of trial counsel on direct appeal. Tennessee courts recognize that defendants are often represented by the same counsel at trial and on direct appeal, as was the case for Moore. Accordingly, under Tennessee law, "failure to raise an ineffective-assistance claim on direct appeal is not grounds for finding the claim waived in post-conviction proceedings." Sutton v. Carpenter, 745 F.3d 787, 793 (6th Cir. 2014). Moore argued in his First Amendment to Amended Petition for Relief From Conviction or Sentence that his trial counsel was ineffective for failing to argue the inadequate showing of necessity in the applications to wiretap David Moore's phones. (Doc. No. 19-16, PageID# 1880.) Neither the trial court nor the TCCA found that claim procedurally barred.

However, although both Moore and Respondent argued this claim in the appeal of Moore's post-conviction petition (Doc. No. 19-19, PageID# 2128; Doc. No. 19-20, PageID# 2164–68), the TCCA did not address it. The post-conviction court's decision is, therefore, the last reasoned state court decision. It is the subject of this Court's review. Barton v. Warden, S. Ohio Corr. Facility, 786 F.3d 450, 462–63 (6th Cir. 2015) (quoting Loza v. Mitchell, 766 F.3d 466, 473 (6th Cir. 2014) ("We review the decision of the last state court to issue a reasoned opinion on the issues raised in a habeas petition.")).

The post-conviction court found that the suppression hearing arguments of co-counsel focused on the first four wiretap applications, those pertaining to co-defendant Tim Brown's

phones, because these applications "were incorporated by reference in all of the subsequent wiretap applications and extensions." (Id. at PageID# 1912.) Co-counsel argued that, because "these first wiretaps were deficient, all of the other wiretap applications which resulted from the fruits of the first applications were inadmissible." (Id.) Quoting the TCCA's opinion on direct appeal, which found the necessity requirement satisfied, the post-conviction court found that Moore's arguments regarding the allegedly inadequate statements of necessity in the wiretap applications had "been previously litigated and lack[ed] merit." (Id. at PageID# 1917.)

The post-conviction court's decision was not objectively unreasonable. Although co-counsel's oral argument on the suppression motion primarily addressed the original wiretap application of Tim Brown's phones (Doc. No. 19-16, PageID# 1912), she fully briefed the question of whether adequate necessity had been shown with regard to the wiretap of David Moore's phones. In her supplemental brief, co-counsel argued:

> The Application relies exclusively on the fruits of the wiretap for David Moore's phone to establish nexus to Darryl Moore's telephone number and to provide specific information about Darryl Moore for the remaining probable cause purposes. Lacking from the Application is any statement that other investigative techniques were "tried and failed or why they reasonably appear[ed] to be unlikely to succeed if tried or to be too dangerous" as to Darryl Moore. The Affidavit does not discuss any surveillance conducted on Darryl Moore, questioning of witnesses as to Darryl Moore, use of search warrants as to Darryl Moore or infiltration of undercover agents relating to Darryl Moore. In fact, it appears from the four (4) corners of the Affidavit that the only "normal investigative procedures" or "first resort" techniques which was used or seriously contemplated before resorting to wiretapping Darryl Moore's telephone was the pen register. This lack of requisite necessity is fatal to the wiretap.

(Doc. No. 19-1, PageID# 326–27.) Co-counsel's brief thus emphasized the requisite necessity of a wiretap application Moore had standing to challenge. Her motion also argued generally that all of the wiretap applications "were insufficient to demonstrate that law enforcement

officers had made a good faith effort to utilize other investigative techniques" and "failed to demonstrate why other investigative techniques . . . reasonably appeared to be unlikely to succeed or too dangerous if tried." (Id. at PageID# 281.) That co-counsel elected to focus her oral argument on one aspect of the suppression argument was a strategic choice that "falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Accordingly, Moore is not entitled to habeas relief on his claim of ineffective assistance of counsel.

### C. Consecutive Sentences

Moore was sentenced to consecutive terms for his offenses under Tennessee Code Annotated § 40-35-115(b), which allows consecutive sentencing when:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist . . . ;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life . . . ;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor . . . ;
>
> (6) The defendant is sentenced for an offense committed while on probation; or
>
> (7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

Moore argues that Tennessee's consecutive sentencing scheme violates the Sixth Amendment because "the imposition of consecutive sentencing on the basis of judicially determined facts violates the Petitioner['s] federal constitutional rights as explicated in Apprendi v. New Jersey, 530 U.S. 466 . . . (2000), and Blakeley v. Washington, 542 U.S. 296 . . . (2004)." (Doc. No. 2, PageID# 34–35.) He also asserts that the trial court's findings that

he was a professional criminal and a dangerous offender violated his due process rights and were "based on an unreasonable determination of the facts in light of the evidence presented." (Id.)

The Tennessee Supreme Court has determined that the statutory provision for consecutive sentencing does not violate Apprendi or Blakeley. State v. Allen, 259 S.W.3d 671, 688–89 (Tenn. 2008)). The Tennessee Supreme Court held that, because "[c]onsecutive sentences are separate punishments for different offenses . . . the principles underlying Apprendi, do not apply to consecutive sentences because a judge's decision on how two separate sentences for two distinct crimes shall be served is entirely different from the jury's determination of whether the elements of a crime, necessary for a particular sentence for that crime, have been committed." Id. (quoting State v. Keene, 927 A. 2d 398, 407–08 (Me. 2007)). The TCCA applied this decision in denying Moore's claim that the application of consecutive sentencing in his case was improper. Moore, 309 S.W.3d at 533.

The TCCA's application of Allen was not contrary to clearly established federal law. The Supreme Court of the United States has determined that state statutes like Tennessee's which allow for judicial factfinding in the context of imposing consecutive sentences do not run afoul of the Sixth Amendment or Apprendi. Oregon v. Ice, 555 U.S. 160, 163–64 & n.3, 171–72 (2009) (citing Tenn. Code Ann. § 40-35-115(b) and Allen, 259 S.W.3d at 671). The TCCA's determination falls squarely within that clearly established precedent.

Likewise, the TCCA did not make an unreasonable determination of the facts based upon the evidence presented to the trial court. Based upon the evidence and testimony presented at Moore's sentencing hearing, the trial court found that he had a criminal history that included a federal conviction for which he served a sixty-three-month sentence and five

years of supervised release. (Doc. No. 19-6, PageID# 1085.) The trial court found that, "as soon as [Moore got] out" from serving the federal sentence, he committed the crimes to which he pleaded guilty. (Id. at PageID# 1090.) Noting the lack of evidence of Moore's legitimate employment, the trial court found that Moore is a "professional criminal who has devoted his life to being a criminal as a major source of income." (Id. at PageID# 1090–91.) The trial court also found that Moore was on federal supervised release at the time he committed the underlying offenses. (Id.at PageID# 1091.) On that basis, the trial court found "no question" that Moore met the statutory criteria for consecutive sentences. (Id.)

The TCCA found that the trial court did not abuse its discretion in reaching that conclusion. Considering Moore's post-conviction petition, the TCCA found that, "in addition to finding the Petitioner to be a professional criminal with an extensive criminal history, the trial court ordered consecutive sentencing because the Petitioner was on probation when he committed the crimes in this case. That factor alone would have justified the trial court's decision to order consecutive sentencing." Moore II, 2013 WL 4677578, at *8. While Moore contests the trial court's finding that he was a professional criminal and had been involved with drugs for his whole life, Moore concedes that he was on supervised release at the time of his arrest. (Doc. No. 2, PageID# 35.) The TCCA's finding that the trial court did not abuse its discretion in applying consecutive sentencing is therefore not based upon an unreasonable determination of the facts as supported by the evidence introduced in the state court proceeding. 28 U.S.C. § 2254(d). Moore is not entitled to relief on this ground.

## V.      Conclusion

For the foregoing reasons, the habeas corpus petition will be denied and this matter will be dismissed with prejudice.

The Court must issue or deny a certificate of appealability (COA) when it enters a final order denying a § 2254 petition. Rule 11, Rules Gov'g § 2254 Cases. Moore may not take an appeal unless the Court issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if a petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A "substantial showing" is made with a petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues presented were "adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).

In this case, the issues raised in the petition do not merit further review. Thus, the Court will DENY a COA. Moore may, however, seek a COA directly from the United States Court of Appeals for the Sixth Circuit. Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
Chief United States District Judge